Mark D. Meyer
UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.
#2 Railroad Square, Suite B
P.O. Box 1746
Great Falls, MT 59403
Telephone: (406) 771-0007
Facsimile:   (406) 452-9360

Attorneys for Defendant Bruce Harold Sunchild

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

———————————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 14-47-GF-BMM |
| | ) | CR 14-71-GF-BMM |
| Plaintiff, | ) | CR-14-102-GF-BMM |
| | ) | |
| -vs- | ) | |
| | ) | **DEFENDANT BRUCE** |
| BRUCE HAROLD SUNCHILD, | ) | **HAROLD SUNCHILD'S** |
| | ) | **CONSOLIDATED** |
| Defendant. | ) | **SENTENCING** |
| | ) | **MEMORANDUM** |
| | ) | |
| | ) | |

Defendant Bruce Harold Sunchild is scheduled to appear before the Court on

March 10, 2015, for sentencing in the following:  (1) *United States v. Bruce Sunchild*,

CR-14-47-GF-BMM (Theft from an Indian Tribal Organization and Bribery of a Tribal

Government Official); (2)  *United States v. Bruce Sunchild*, CR-14-71-GF-BMM

(Theft from an Indian Tribal Organization); and (3) *United States v. Bruce Sunchild*,

CR-14-102-GF-BMM (Income Tax Evasion).

The United States Probation Officer has calculated a guideline range of 87 to 108 months (Total Offense Level 29; Criminal History Category I).

Consistent with the parties' Plea Agreement, the United States has agreed that the more lenient gratuity guideline found in U.S.S.G. § 2C1.2 should be applied, which would reduce the base offense level by 3 levels and result in a guideline range of 63 to 78 months (Total Offense Level 26; Criminal History Category I).  (Doc. 81).  The Government has asked the Court to impose a sentence at the mid-range of that guideline range -- a term of 70 months incarceration.  (Doc. 81).

**ARGUMENT**

A.      **Unresolved Objections to the Presentence Investigation Report**

1.      **Loss Amount/Enhancement Under U.S.S.G. § 2B1.1(b)(1)(G)**

The PSR determined the applicable loss amount was $300,000 and, as a result, imposed a twelve point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G).  *See*, PSR at ¶ 62.  For the reasons set forth herein, the record does not support the imposition of a 12 point enhancement under U.S.S.G. § 2B1.1(b)(1)(G), particularly in light of the disparate impact application of that guideline provision has on Mr. Sunchild's advisory guideline range.

As set forth above, the Government has agreed to recommend that the Court apply the more lenient gratuity guideline found at U.S.S.G. §2C1.2.  (Doc. 81). Section 2C1.2 has a narrower loss element, as it provides as follows:

> (2)  If the **value of the gratuity** exceeded $5,000, increase by the number of levels from the tables in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

*See*, U.S.S.G. § 2C1.2(b)(2) (emphasis added).

The Government acknowledges that "[u]nder some circumstances, where the transaction involved only Sunchild and K & N Consulting, Sunchild may only have an enhancement related to the $24,977 that was spent for the benefit of Sunchild in the purchase of Belcourt's Suburban for his daughter."  *United States' Consolidated Sentencing Memorandum* at p.13.  (Doc. 81).

Notwithstanding, the Government argues the transfer of the Suburban was not limited to those two participants.  *Id.*  Rather, the Government argues the transfer of the $300,000 was the result of a group action and, because it was "jointly undertaken criminal activity," the relevant loss amount must be determined under U.S.S.G. § 1B1.3(a)(1)(b).  *Id.*

"Jointly undertaken criminal activity" is a "criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy."  U.S.S.G. § 1B1.3, Application Note 2.

As reflected in the PSR, both Mr. Sunchild and his codefendant, Shad Huston, have stated the transfer of the Suburban was a gratuity based upon prior public actions, and was not a *quid pro quo* for agreeing to the $200,000 payment that went to Tony Belcourt.  *See*, PSR at ¶ 26.  Specifically, Huston has stated under oath as follows:

> 75.    The car I purchased for Bruce Sunchild's daughter was a reward for Chairman Sunchild coming through on his commitment that my businesses would be paid if they did business with the Tribe.  By the fall of 2011, I was becoming desperate.  My collective businesses were owed approximately $600,000.  The roughly $87,000 K & N received against its outstanding invoices allowed me to keep K & N and my other businesses afloat.

> 76.    When I gifted the car to Chairman Sunchild's daughter there had been no prior understanding that I would do so.  In fact, Chairman Sunchild told me when I delivered the car that he wished to repay me for the car over time at the rate of $400/month.  I refused to take his money.  No other individual was party to my decision to reward Chairman Sunchild.  Accordingly, I did not act and could not have acted as an organizer, leader, manager or supervisor of other individuals.  I was the sole perpetrator of the offense.

*Declaration of Shad James Huston*, **U.S. v. Tony James Belcourt, et al**., CR-13-98-GF-BMM (Doc. 78).

Moreover, Mr. Sunchild, during his debriefing and during his change of plea hearing, categorically denied any prior knowledge (or any knowledge prior to being served with the underlying Indictment) regarding the $200,000 that ultimately was directed to Tony Belcourt.  *See*, PSR at ¶ 24.

4

Section 1B1.3 explicitly makes a distinction among members of a conspiracy in terms of "the scope" of the activity.  *See*, **United States v. Whitecotton**, 142 F.3d 1194, 1197 (9th Cir. 1998) ("[R]elevant conduct is not necessarily the same for every participant.").  This approach distinguishes the Guidelines from the general harsh law of conspiracy that a conspirator is "'bound by all that has gone on before in the conspiracy.'"  **United States v. DiCesare**, 765 F.2d 890, 900 (9th Cir.1985).

U.S.S.G. § 1B1.3, Application Note 2, expressly cautions that because allegations of conspiracy are often worded broadly, conduct for which a defendant may be held responsible for purposes of relevant conduct at sentencing is not necessarily the same as the scope of the conspiracy for which a defendant is criminally accountable. The conduct must be "jointly undertaken *and* "reasonably foreseeable" to be relevant for purposes of sentencing, *i.e.,* determining loss valuation.  *See*, U.S.S.G. § 1B1.3; **United States v. Ortiz**, 362 F.3d 1274, 1277 (9th Cir. 2004) (holding that a district court must find that the conduct of others was *both* jointly undertaken *and* reasonably foreseeable).

Courts construe U.S.S.G § 1B1.3 to require substantial and specific findings beyond the "conduct of the conspiracy" before the acts and omissions of coconspirators can be used to determine the "relevant conduct" of an individual defendant.  **United States v. Melton**, 131 F.3d 1400, 1405 (10th Cir. 1997)

(reasonable foreseeability "is not by itself sufficient to establish liability for the acts of coconspirators.… [S]uch acts also must be in furtherance of 'jointly undertaken criminal activity' ") (quotations omitted); *United States v. McDuffy*, 90 F.3d 233, 236 (7th Cir. 1996) (reasonable foreseeability not enough; "[A] defendant does not become liable in sentencing for the acts of coconspirators if those acts did not advance an objective within the scope of the conspiracy that he joined.").

The conduct of other individuals as joint participants in criminal activity with Mr. Sunchild may be counted as Mr. Sunchild's own relevant conduct **if** those activities were reasonably foreseeable. *United States v. Sheahan*, 31 F. 3d 595, 602 (8th Cir. 1994). Here, there is an inadequate factual basis to make the requisite showing that the $300,000 was relevant conduct as it pertains to Mr. Sunchild. Restated, the record is devoid of any basis upon which to conclude the $300,000 was the result of "jointly undertaken" **and** "reasonably foreseeable" conduct. *See*, U.S.S.G. § 1B1.3; *Ortiz*, 362 F.3d at 1277.

The Government, relying upon *United States v. Hightower*, 484 Fed.Appx. 203 (9th Cir. 2012), argues $300,000 is the correct loss amount for the "jointly undertaken criminal activity." *Government's Consolidated Sentencing Memorandum* at p. 14 (Doc. 81).

The Government's reliance on *Hightower* is misplaced as the decision is

6

factually distinguishable.  The defendant in Hightower was convicted of conspiracy, mail fraud, and wire fraud in connection with an advertising scheme.  *Hightower*, 484 Fed.Appx. at 204.  At sentencing, the district court imposed a 16 level enhancement based upon a determination that the loss amount exceeded $1 million.  *Id.*  On appeal, the Ninth Circuit rejected Hightower's argument that the district court erred in basing the loss amount on the losses and victims of the entire conspiracy, rather than only those for which he was personally responsible.  *Id.*

In so holding, the Ninth Circuit noted that while Hightower was a low-level participant, he was part of an interdependent scheme that relied on cooperation between salespeople and other employees of RAB Publications.  The Court also noted Hightower worked and participated in the scheme for approximately three years, knowing it was fraudulent from the beginning.  *Id.* at 205.

Hightower's level of culpability, *i.e.*, knowingly participating in a fraudulent scheme for three years, stands in stark contrast to Mr. Sunchild's conduct.

The Government, in asserting $300,000 is the correct loss amount, contends:

> Sunchild knew, by his own admission, that $200,000 of the money was going to Tony Belcourt.  Based on history and circumstances, he knew, or reasonably would have foreseen, that the remaining money would be divvied up.  He knew K & N Consulting had no legitimate debt owing from the tribe.

*Government's Consolidated Sentencing Memorandum* at p. 14 (Doc. 81) (emphasis

added).  The Government's argument is based on presumptions and inferences drawn from the events at issue, and stands in stark contrast to the denials issued by Mr. Sunchild and Huston.

As a result, the record lacks a sufficient factual basis to impose the 12 point enhancement under U.S.S.G. § 2B1.1(b)(1)(G).  That is even more apparent given the impact application of that guideline provision has on Mr. Sunchild's advisory guideline range.

While the ordinary standard of proof for factual findings underlying sentencing enhancements is preponderance of the evidence, *see United States v. Riley*, 335 F.3d 919, 925 (9th Cir.2003), application of a clear and convincing standard is appropriate where the enhancement has "'an extremely disproportionate effect'" on the sentence. *See, United States v. Bonilla–Montenegro*, 331 F.3d 1047, 1050 (9th Cir. 2003) (clear and convincing standard applies where 16–level enhancement increased defendant's sentencing range from 6 to 12 months to 63 to 78 months); *United States v. Mezas de Jesus*, 217 F.3d 638, 642–44 (9th Cir. 2000) (clear and convincing standard applies where 9–level enhancement for uncharged conduct increased defendant's sentencing range from 21 to 27 months to 57 to 71 months).

The application of U.S.S.G. § 2B1.1(b)(1)(G) significantly enhances Mr. Sunchild's base offense level and his resultant advisory guideline range.  The factual

basis relied upon by the Government to support that enhancement has not been proved by clear and convincing evidence and the Court should decline to impose a 12 level enhancement under U.S.S.G. § 2B1.1(b)(1)(G).

The loss attributable to Mr. Sunchild's offense is, at most, $24,977.00, the amount Shad Huston paid Tilleman Motors to clear the title and transfer Tony Belcourt's Chevrolet Suburban to Bruce Sunchild's daughter. *See*, PSR at ¶ 24. Based upon a loss figure of $24,977.00, U.S.S.G § 2B1.1(b)(1)(C) would impose an offense level increase of 4 levels, instead of the 12 level enhancement imposed under U.S.S.G. § 2B1.1(b)(1)(G).

Utilizing the gratuity guideline found in U.S.S.G. § 2C1.2, and applying a 4 level increase under U.S.S.G § 2B1.1(b)(1)(C) would result in a Total Offense Level of 18 and a resulting guideline range of 27 to 33 months. Mr. Sunchild submits that is the appropriate advisory guideline range upon which to determine an appropriate sentence in this matter.

## 2. Minor Participant

A mitigating role adjustment is intended for a defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, Application Note 3(A). The determination is "heavily dependent upon the facts of the particular case" and should be made after weighing the

"totality of the circumstances."   U.S.S.G. § 3B1.2, Application Note 3(C).   A defendant's role should be "measured against his co-participants, not a hypothetical 'average participant.'" *United States v. Johnson*, 297 F.3d 845, 874-75 (9th Cir. 2002). A participant in this sense, however, includes not only those charged in the same indictment, but also "other likely actors" such as "the alleged . . . supplier and the . . . distributor", who, although not identified by name nor charged in the indictment, should be considered if the court finds sufficient evidence of their existence and participation in the overall scheme." *United States v. Rojas-Millan*, 234 F.3d 464, 473-74 (9th Cir. 2000).

The Government filed an Offer of Proof in this case that sets forth a wide and varied factual recitation regarding individuals and events unconnected to Bruce Sunchild.  In particular, the Government references meetings that occurred at Leon's Buy and Sell "to devise methods and means to exploit tribal and federal contracts." *Government's Offer of Proof* at p. 6 (Doc. 46).  While defendant Huston disputes the factual accuracy of those allegations, *see Huston Defendants' Response to Prosecution's Sentencing Memorandum* at p. 12-15 (Doc. 71), *U.S. v. Tony Belcourt et. al*, CR 13-98-GF-BMM, it is beyond dispute that the Government has never asserted Bruce Sunchild was a participant or attendee of any of the purported meetings.

Given the clear hierarchy and divisions of the participants in the scheme alleged

by the Government, the record supports the conclusion that Bruce Sunchild deserves a mitigating role adjustment under § 3B1.2.  Mr. Sunchild's participation was minor in comparison with that of the other participants and his conduct was substantially less culpable, and the record supports a reduction for a minor participant under U.S.S.G. § 3B1.2.

## B.   <u>Analysis of 18 U.S.C. § 3553(a) Sentencing Factors</u>

Federal courts are afforded a fair amount of sentencing discretion.  As a practical matter, they are free to impose virtually any sentence so long as it is "reasonable" when viewed in light of the factors set forth in 18 U.S.C. § 3553(a).  A reasonable sentence is one that is "sufficient but not greater than necessary" to achieve the goals of retribution, deterrence, incapacitation, and rehabilitation.  *See*, 18 U.S.C. § 3553(a)(2). To meet those goals, a sentencing court must consider the following six factors:  (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the sentencing guidelines and any relevant policy statements; (5) the need to avoid unwarranted sentencing disparity; and (6) the need to provide restitution to the victim.  The ultimate goal is to find the most reasonable sentence for the particular defendant under consideration.  ***United States v. Carty***, 530 F.3d 984 (9th Cir. 2008)(*en banc*); ***United States v. Zavala***, 443 F.3d 1165 (9th Cir. 2006).

**(1)     The nature and circumstances of the offense and Mr. Sunchild's history and characteristics**

A federal sentence should be proportionate to a defendant's relative culpability. Mr. Sunchild readily acknowledges that his crimes of conviction are serious offenses and that society has every right to signal its disapproval by providing strict punishment. However, that does not justify a sentence that is disproportionate to a defendant's culpability.     The 70 month sentence recommended by the Government disproportionately emphasizes the need for retribution and does not adequately reflect the circumstances of Mr. Sunchild's offenses or his relative culpability.

Notwithstanding the extremely high dollar amounts referenced by the Government in its Offer of Proof, the fact remains, as reflected in the PSR, that Mr. Sunchild's share of those funds was extremely limited at best.  Mr. Sunchild currently receives monthly income from Social Security in the amount of $1,194.00, has total bank assets of approximately $226.00, and monthly expenses that exceed his income. *See*, PSR at ¶ 97.  For all the money underlying the prosecution of this and similar fraud-related crimes on the Rocky Boy's Indian Reservation, it is clear that any financial benefit Mr. Sunchild obtained was relatively fleeting and minor in comparison.

With respect to the sentencing factors set forth in 18 U.S.C. § 3553, it is important to bear in mind that the criminal conduct at issue constitutes Bruce

Sunchild's one and only criminal endeavor, as reflected in the absence of any criminal history. *See*, *PSR* at ¶¶ 72-79. Moreover, Mr. Sunchild is 69 years old. As to defendants over the age of forty, the risk of recidivism drops dramatically, lessening the need to protect the public from further crimes of the defendant under 3553(a)(2)(C). *See* United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

While age and infirmity were discouraged bases for departure, they may be considered under 3553(a). ***United States v. Ryder***, 414 F.3d 908, 920 (8th Cir. 2005). Here, given Mr. Sunchild's age, background, and lack of criminal history, he is extremely unlikely to reoffend.

Third, as reflected in the PSR, Bruce Sunchild has been steadily employed for all of his life and served his tribe faithfully for over thirty years. Mr. Sunchild enlisted in the U.S. Army in 1968 and was honorably discharged from the service in 1970. *PSR* at ¶95. He worked for the Chippewa Cree Tribe in many different capacities from 1972 until 2010. *PSR* at ¶ 94. Twenty-five years were spent working for the Indian Health Service. He was elected to the tribal council in 1994 and has served as the

Vice-Chairman on the Board of Regents for Stone Child College and as a committee member for Rocky Boy Health Board and Tribal Housing Board.  *Id.*

The PSR illustrates Mr. Sunchild's level of commitment to his family and his community.  He requests that this Court allow his lifetime of work and service to speak for him so that it is not overshadowed by his admitted guilt in these cases.

### (2)    The kinds of sentences available

In ***United States v. Cantrell***, 433 F.3d 1269, 1279-81 (9th Cir.2006), the Ninth Circuit adopted a two-step procedure for reviewing sentences imposed after ***Booker***. The Court held district courts are not mandated to sentence within an applicable guideline range because the Sentencing Guidelines are advisory-not mandatory.  ***Id.*** at 1279 (*citing **Booker***, 543 U.S. at 259-60).  However, district courts "'must consult [the] Guidelines and take them into account when sentencing,' even though they now have the discretion to impose non-Guidelines sentences." ***Id.*** (*quoting **Booker***, 543 U.S. at 264).

***Booker*** did not alter the analysis used in determining whether an upward or downward departure from the guidelines is warranted in a given case.  Courts may still depart from the guidelines in cases involving "aggravating or mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines . . . ."  *See*, 18 U.S.C. § 3553(b)(1).  As a

result, courts may sentence below the guideline range if such a sentence would be sufficient to achieve the purposes of punishment. *See*, ***United States v. Mix***, 457 F.3d 906, 913 (9th Cir. 2006)("[I]t is both important and legally necessary under 18 U.S.C. § 3553(a) and under ***Booker*** that the district court conduct parallel analyses – first employing the Guidelines, and then considering non-guideline sentencing factors under § 3553(a).").

In considering deterrence, courts consider both "specific deterrence" of the particular defendant and "general deterrence" of other offenders who might take notice of the sentences handed down in similar cases. As to specific deterrence, Mr. Sunchild has been publicly humiliated and will suffer the stigma of his convictions for the remainder of his life. He has lost important rights of citizenship—the right to vote and hold public office. His shame, together with the more tangible effects of his conviction, indicate that further deterrence in the form of a lengthy imprisonment is unnecessary.

The need for general deterrence is even less clear. While the Government asserts a lengthy period of incarceration is warranted, there is little evidence supporting the argument that lengthy prison sentences deter crime, let alone that a sentence of almost six years is necessary to achieve the retributive and general deterrence objectives applicable to Mr. Sunchild. It is important to bear in mind that "necessary"

15

is the operative word, because section 3553(a) expressly dictates that "[t]he court shall impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph (2) of this subsection" (emphasis supplied).

As to general deterrence, there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders. *See, e.g.,* Richard Frase, *Punishment Purposes,* 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?,* 23 S. Ill. U. L.J. 485, 492 (1998); *cf.* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis supplied); transcript of sentence, **U.S. v. Saad**, 1/17/06, at 33 (similar remarks of Government prosecutor at time of Dr. Saad's sentence).

Experience in other criminal cases, like cases involving crack cocaine and methamphetamine, surely does not support the hope that harsh sentences will end illegal activity. **United States v. Beiermann**, 599 F. Supp. 2d 1087, 1103 (N.D. Iowa 2009) ("Indeed, the persistent racheting up of sentences for drug trafficking has done nothing to slow the tide of criminal activity. If harsh sentences actually worked, this country—or at least the federal government—would have won the "war on drugs"

years ago.  No one I know is even suggesting that we are holding our own in the war

on drugs, let alone winning.  This is so, even though state and federal courts have been

populating our nation's prisons with drug defendants in massive, record numbers for

over twenty-five years.").

Finally, the fraud guideline has been subject to criticism for its overemphasis on

loss.  While the amount of loss is the primary determinant of the offense level for fraud

offenders, loss is a highly imperfect measure of the seriousness of the offense.  *See,*

*United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006)(criticizing "the

inordinate emphasis that Sentencing Guidelines place in fraud on the amount of actual

or intended loss" without any explanation of "why it is appropriate to accord such huge

weight to this factor[]").

As noted by the court in *United States v. Gupta*, 904 F.Supp2d 349, 351

(S.D.N.Y. 2012):

> In fairness, this vast increase in white collar sentencing was partly
> mandated by Congress, reacting in turn to public outcry over such
> massive frauds as Enron and WorldCom.  But in implementing the
> Congressional mandate, the Sentencing Commission chose to focus
> largely on a single factor as the basis for enhanced punishment: the
> amount of monetary loss or gain occasioned by the offense.  By
> making a Guidelines sentence turn, for all practical purposes, on
> this single factor, the Sentencing Commission effectively ignored
> the statutory requirement that federal sentencing take many factors
> into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively
> guaranteed that many such sentences would be irrational on their
> face.

The bulk of the points constituting Mr. Sunchild's total offense level (and the resultant advisory guideline range computed in the PSR), come from the 12 level enhancement imposed under U.S.S.G. § 2B1.1(b)(1)(G). As set forth above, the record does not support the imposition of an enhancement under U.S.S.G. § 2B1.1(b)(1)(G), particularly in light of the disparate impact application of that guideline provision has on Mr. Sunchild's advisory guideline range. See, **Gupta**, 904 F.Supp2d at 351 ("It might be argued that the Guidelines still work to minimize disparities. But if the sentences so calculated are the product of placing an overwhelming emphasis on a factor that may be central to some frauds but largely incidental to others, the effect is to create, in the name of promoting uniformity, a sentencing disparity of the most unreasonable kind.").

Aside from his instant convictions, Mr. Sunchild has no criminal history. He performed well on pretrial release. Mr. Sunchild's personal history and proven ability to abide by conditions of supervision indicate that he does not pose a danger to the public. In light of the above referenced factors, the record does not support a lengthy period of incarceration for Mr. Sunchild.

### (3)      The need to avoid unwarranted disparities

Sentencing courts must "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *See*,

18

18 U.S.C. § 3553(a)(6).  As the Government has pointed out, this District (and this Court in particular) has seen a number of fraud cases in the recent past.  The sentences handed down in those cases, indicate that the Government's recommendation, if adopted, would result in unreasonable sentencing disparity.

In *United States v. William Szudera*, CR-13-16-GF-DLC, the defendant was a 76 year old man from Havre who pleaded guilty to mail fraud.  The Government alleged that he failed to report that he owned a profitable business while receiving more than $277,000 in federal workers compensation benefits from 2001 to 2012.  On December 26, 2013, Judge Christensen sentenced Szudera to four years of probation, a fine of $3,000, and restitution in the amount of $83,700.

In *United States v. Old Horn*, CR-12-103, the defendants were indicted for, *inter alia*, conspiracy to defraud the Crow Tribe by diverting various companies' payments for monitoring services to the tribal monitor rather than the Crow Tribe.  The defendants involved in the conspiracy received sentences ranging from five years probation to six months imprisonment.

In an out-of-district case, *United States v. Dawena Pappan*, CR-09-295, the defendant was convicted of embezzling funds from the Tonkawa Tribe of Oklahoma.  She had served as the Tribe's Secretary-Treasurer and was a member of the Tribe's Business Committee.  She plead guilty to having conspired with other tribal officers

over the course of three years to embezzle several hundred thousands of dollars from her tribe's casino.  In June, 2012, she was sentenced to five years probation and ordered to make restitution of almost $600,000.

### (4)     The need to provide restitution to the victim

It is beyond dispute that Mr. Sunchild will be saddled with a large restitution obligation.  It is equally apparent that a lengthy custodial sentence will do nothing to help him attempt to meet that obligation.

## C.     Recommended Sentence

A 70 month sentence is disproportionate to Mr. Sunchild's relative culpability and does not accurately reflect the need for retribution.  "Respect for the law is promoted by punishments that are fair, not by those that simply punish for punishment's sake. . . .  There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves harsh punishment receives a slap on the wrist." *United States v. Stern*, 590 F.Supp.2d 945, 956-57 (N.D. Ohio 2008).

Recognizing that Mr. Sunchild has committed serious crimes, it is nevertheless clear that the Government's recommendation is unreasonable.  It advocates for a sentence that is "greater than necessary" to accomplish the goals of 18 U.S.C. §

3553(a).

Given all the circumstances, Mr. Sunchild requests the Court to impose a sentence of probation, followed by a period of supervised release with whatever conditions the Court deems appropriate.  A sentence of probation is appropriate to meet the directives of 18 U.S.C. § 3553(a), particularly in light of the fact that Bruce Sunchild is a 69 year old man with no criminal history, who possesses the personal qualities that, when viewed in light of the factors set forth above, support such a sentence.

Mr. Sunchild has fully accepted responsibility for his offenses and blames no one but himself.  This is his first criminal conviction.  A probationary sentence will properly reflect the seriousness of the offense, promote respect for the law and provide just punishment.  The United States Supreme Court has recognized that probation is a serious punishment.  In *Gall v. United States*, 552 U.S. 38 (2007), the Court acknowledged that probation is not an act of "leniency," but is a "substantial restriction of freedom" that "can have a significant impact on both th[e] person and society." *Gall*, 552 U.S. at 48-49 & n.4 (citations omitted).

Mr. Sunchild is a non-violent offender.  A probationary sentence will allow him to work and pay restitution.  *See*, *United States v. Menyweather*, 431 F.3d 692, 702 (9th Cir. 2005)(a probationary sentence affirmed because Menyweather would be better

21

able to pay the $35,918 he embezzled from the Los Angeles United States Attorneys' Office).

Mr. Sunchild has been deterred.  Mr. Sunchild is guilty of Federal felonies.  He has been and will be deterred from future criminal conduct.  A sentence of probation will not alter Mr. Sunchild's deterrence.  Given his lack of criminal history and his personal history and characteristics, he is not likely to re-offend.

Finally, a probationary sentence will provide Mr. Sunchild with the opportunity to pay back restitution.

Based upon Bruce Sunchild's financial condition, as set forth in the PSR, the Court is requested to decline to impose a fine in this matter.

DATED this 6th day of March, 2015.

By: /s/ Mark D. Meyer
      Mark D. Meyer
      Ugrin, Alexander, Zadick & Higgins, P.C.
      Attorneys for Defendant Bruce Harold Sunchild

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 47.2, this certifies that the body of the attached memorandum contains 4,926 words, excluding the caption and the Certificate of Compliance. The word count function of the word-processing system used to prepare this brief was relied upon in this calculation.

DATED this 6th day of March, 2015.

By: /s/ Mark D. Meyer
Mark D. Meyer
Ugrin, Alexander, Zadick & Higgins, P.C.
Attorneys for Defendant Bruce Harold Sunchild